U.S. DISTRICT COURT
ESTERN DIST.      F LOUISIANA
RECEIVED

OCT - 7 2015

TONY R. MOORE, CLERK
BY _____
            DEPU..

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

b

| | |
|---|---|
| FREDDIE R. LEWIS,<br>          Plaintiff | CIVIL ACTION<br>SECTION "P"<br>NO. 1:10-CV-00291 |
| VERSUS | |
| MARK CHATTERSON, et al.,<br>          Defendants | JUDGE JAMES T. TRIMBLE, JR.<br>MAGISTRATE JUDGE JAMES D. KIRK |

REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE

Before the court is a civil rights complaint filed pursuant to 42 U.S.C. § 1983, in forma pauperis, by pro se plaintiff Freddie R. Lewis ("Lewis") on February 2, 2010 (Doc. 1). The remaining defendants are the Secretary of the Louisiana Department of Public Safety and Corrections ("LaDPCS") (James LeBlanc), Corrections Corporation of America ("CCA") (the company that operates WCC), Jack Garner (president of CCA), WCC, Timothy Wilkinson (the former warden of WCC), Jay Tim Morgan (the current warden of WCC), "CCA Security Millie," "CCA Security Sawyer," "CCA Security Johnson," Virgil Lucas (the former security chief at WCC), Mrs. Melton, Carol Melton, and Theodore Johnson (Doc. 1).

Lewis is complaining about twice daily strip searches that took place in the WCC garment factory at WCC, where he worked in 2009 through 2010. Lewis contends the strip searches were unreasonable, unconstitutional, and without probable cause. Lewis's other claims have been denied and dismissed (Doc. 88).

Defendants Mrs. Millie Melton, Officer Sawyer, and Officer

Johnson were not served and have not made a general appearance in the case (Doc. 92). Accordingly, it will be recommended that the complaint against these defendants be dismissed without prejudice under Fed.R.Civ.P. 4(m). See McGinnis v. Shalala, 2 F.3d 548, 550 (5th Cir. 1993), cert. den., 510 U.S. 1191, 114 S.Ct. 1293, 127 L.Ed.2d 647 (1994); Systems Signs Supplies v. U.S. Dept. of Justice, 903 F.2d 1011, 1013 (5th Cir. 1990); Kersh v. Derosier, 851 F.2d 1509, 1512 (5th Cir. 1988).

Defendants CCA, Garner, Lucas, Secretary LeBlanc, Johnson, Carol Melton, Morgan, and Wilkinson answered the complaint (Docs. 89, 96) and filed a statement of issues for trial (Doc. 100). Lewis also filed a statement of issues for trial (Doc. 101). Defendants filed a motion for summary judgment (Doc. 106), to which Lewis responded (Doc. 108), defendants replied (Doc. 109), and Lewis responded again (Doc. 110).

Defendants' motion for summary judgment is now before the court for disposition.

<u>Law and Analysis</u>

<u>Summary Judgment</u>

Rule 56 of the Federal Rules of Civil Procedure mandates that the court shall grant a summary judgment:

> "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Paragraph (e) of Rule 56 also provides the following:

"If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials-including the facts considered undisputed-show that the movant is entitled to it; or (4) issue any other appropriate order."

Local Rule 56.2W (formerly 2.10W) also provides that all material facts set forth in a statement of undisputed facts submitted by the moving party will be deemed admitted for purposes of a motion for summary judgment unless the opposing party controverts those facts by filing a short and concise statement of material facts as to which that party contends there exists a genuine issue to be tried.

In this regard, the substantive law determines what facts are "material." A material fact issue exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. However, the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient to preclude summary judgment; there must be evidence on which the jury could reasonably find for the plaintiff. Stewart v. Murphy, 174 F.3d 530, 533 (5th Cir. 1999), 528 U.S. 906, 120 S.Ct. 249 (1999), and cases cited therein.

If the movant produces evidence tending to show that there is no genuine issue of material fact, the nonmovant must then direct the court's attention to evidence in the record sufficient to

3

establish the existence of a genuine issue of material fact for trial.   In this analysis, we review the facts and draw all inferences most favorable to the nonmovant.  <u>Herrera v. Millsap</u>, 862 F.2d 1157, 1159 (5th Cir. 1989).   However, mere conclusory allegations are not competent summary judgment evidence, and such allegations are insufficient, therefore, to defeat a motion for summary judgment.  <u>Topalian v. Ehrman</u>, 954 F.2d 1125, 1131 (5th Cir.), cert. den., 506 U.S. 825, 113 S.Ct. 82 (1992).

<u>Strip Searches</u>

Lewis contends the twice daily strip searches of the inmates working in the garment factory at WCC are unconstitutional, without probable cause or reasonable suspicion, violate LaDPSC regulations for searches, and do not serve a valid security interest.

1.

The inquiry of federal courts into prison management must be limited to the issue of whether a particular system violates any prohibition of the Constitution or, in the case of a federal prison, a statute.   The wide range of "judgment calls" that meet constitutional and statutory requirements are confided to officials outside of the Judicial Branch of Government.  <u>Bell v. Wolfish</u>, 441 U.S. 520, 562, 99 S. Ct. 1861, 1886 (1979).   The Fifth Circuit has stated that it "is required, as a matter of both common sense and law, to accord prison administrators great deference and flexibility in carrying out their responsibilities to the public

4

and to the inmates under their control, including deference to the authorities' determination of the 'reasonableness of the scope, the manner, the place and the justification for a particular policy.'" Elliott v. Lynn, 38 F.3d 188 (5th Cir. 1994), cert. den., 514 U.S. 1117, 115 S.Ct. 1976 (1995), citing Hay v. Waldron, 834 F.2d 481, 486 (5th Cir. 1987).

Prison officials are entitled to wide-ranging deference for their policies designed to maintain institutional security. Bell, 441 US at 558, 99 S.Ct. at 1884. Under appropriate circumstances, visual body cavity searches of prisoners can be constitutionally reasonable. Johnson v. Scott, 31 Fed.Appx. 836, **1 (5th Cir. 2002), citing Elliott v. Lynn, 38 F.3d 188, 191 (5th Cir. 1994).

The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted. Bell, 441 U.S. at 559, 99 S. Ct. at 1884, and cases cited therein.

The Court in Bell stated, "A detention facility is a unique place fraught with serious security dangers. Smuggling of money, drugs, weapons, and other contraband is all too common an occurrence. And inmate attempts to secrete these items into the

facility by concealing them in body cavities are documented in this record ...and in other cases." Visual body-cavity inspections conducted in the manner contemplated by the prison rules can be conducted on less than probable cause and do not constitute punishment since they are reasonable responses to legitimate security concerns. <u>Bell</u>, 441 U.S. at 1885-1886, 99 S.Ct. at 559.

A prisoner's rights are diminished by the needs and exigencies of the institution in which he is incarcerated. He thus loses those rights that are necessarily sacrificed to legitimate penological needs. <u>Moore v. Carwell</u>, 168 F.3d 234, 236-37 (5th Cir. 1999), citing <u>Elliott</u>, 38 F.3d at 190-191. When evaluating the security policies adopted by the prison administrators, the court is not required to apply a least restrictive means test. <u>Elliott</u>, 38 F.3d 188, 191 (5th Cir. 1994) (visual body cavity searches were conducted in full view of the entire dorm), citing <u>Hay</u>, 834 F.2d at 485.

Visual cavity searches are necessary not only to discover but also to deter the smuggling of weapons, drugs, and other contraband into the institution. <u>Bell</u>, 441 US at 558, 99 S.Ct. at 1884. In <u>Elliot</u>, the Fifth Circuit found a collective strip search of all inmates in an institution-wide shakedown, in a large, non-private room and in the presence of extra guards, was constitutionally reasonable. See also, <u>Montgomery v. Johnston</u>, 184 F.2d 816, *1 (5th Cir. 1999) (strip searches are reasonably related to the legitimate

penological interest in security); <u>Kelley v. Handorf</u>, 96 F.3d 1442, *1 (5th Cir. 1996)(strip searches in non-secluded areas of prisoners classified as assaultive are reasonably related to the legitimate penological interest in security); <u>Clark v. Collins</u>, 5 F.3d 1494, *2 (5th Cir. 1994) (prison officials may constitutionally conduct strip searches to maintain prison security; <u>Hay</u>, 834 F.2d at 486 (routine strip searches of inmates going in and out of the segregated housing unit was reasonably related to legitimate security needs to prevent the transfer or concealment of prison contraband).

2.

Defendants show, in the affidavit of Becky Dougan, the director of the Prison Enterprises Garment Factory at WCC, that she is the "plant manager" of the facility, and Carol Melton and Joshua Clark provide security for the WCC Garment Factory (Doc. 106, Ex.). Defendants further show in affidavits by Dougan, Melton, Clark, and Warden Morgan that the Garment Factory contains sewing machines, cutting tables and other devices, and that a Culinary Arts class and a Carpentry class are in the same building as the Garment Factory (Doc. 106 Ex.). Dougan states in her affidavit that inmates assigned to work in the Garment Factory may ask to be "reclassified" so they may work somewhere else, and those requests for reclassification are routinely approved (Doc. 106, Ex.).

Dougan, Melton, Clark, and Warden Morgan state in their

affidavits that, each day, more than eighty inmates work in the Garment Factory with sewing machines, needles, scissors, specialized clippers, other tools, machines, nails, electrical cords, and other items (Doc. 106, Ex.). Dougan states in her affidavit that the cutting room area and the tool room, which houses hand tools, are partially secluded; inmates check out tools by retrieving them and leaving their ID card hanging on the nail from which they retrieved the tool (Doc. 106, Ex.). Dougan, Melton, Clark, and Warden Morgan explain in their affidavits that the Culinary Arts and Carpentry classes also use tools, and that there is a sally-port adjacent to the Garment Factory where supply trucks are unloaded and civilian drivers (who are not searched) mingle with the inmates unloading the trucks; also, trustee inmates who work outside the prison leave and re-enter the facility daily through the sally-port, and inmates in the Garment Factory mingle with the trustees during smoke breaks (Doc. 106, Ex.). Dougan, Melton and Clark further explain in their affidavits that all three areas, the Garment Factory, Carpentry, and Culinary Arts, break for lunch near the lunch hour on a staggered basis and, to go to lunch, inmates re-enter the main prison area through the Cypress Exit door to go "on the walk"; before being allowed to re-enter "the walk" through the Cypress Exit, all tools from each area must be returned and properly stored, then each inmate must be visually strip-searched, then pass through a metal detector (Doc. 106, Ex.).

Dougan, Melton, Clark and Warden Morgan state in their affidavits that the same security procedures (tools confirmed returned, strip search, metal detector) are used at the close of the work/vocation day, and whenever inmates have to leave the Garment Factory building for reasons such as medical appointments, classes or other scheduled events (Doc. 106, Exs.). Dougan, Melton and Clark state in their affidavits that some inmates have to be searched every day when they leave for their daily medical appointments (Doc. 106, Exs.).

Dougan, Melton, Clark and Warden Morgan further state in their affidavits that prison "counts" of every inmate at the facility take place several times each day; if the numbers do not match, then every inmate must immediately be returned to his bed for a "bed count," which is conducted rapidly to confirm the presence of inmates in the facility (Doc. 106, Ex.). When there is a bed count, the Garment Factory area is cleared of all inmates quickly (Doc. 106, Ex.).

Dougan and Melton state in their affidavits that females do not participate in the strip searches and that Dougan and Melton never participated in the searches (Doc. 106, Exs.). Dougan and Melton further stated in their affidavits that the room used to strip search inmates has windows on each side for security purposes (Doc. 106, Ex.).

Melton and Clark state in their affidavits that inmates walk

through the metal detector one at a time, but the metal detector sometimes malfunctions; it might go off when there was no one inside it and it could sometimes fail to detect the presence of small amounts of metal, such as the metal clasp on a name badge (Doc. 106, Ex.). Melton stated that wood scraps from the Carpentry shop, plexi-glass from the Garment Factory, and contraband such as drugs, stolen clothes, money and cell phones would not set off the metal detector (Doc. 106, Ex.). Melton points out in her affidavit that inmates in the Garment Factory (as well as inmates in the Carpentry and Culinary Arts classes) posed risks because they were all in routine contact with civilian trucks, truck drivers and trustees, they all worked daily with items that could easily be concealed and turned into weapons, and the metal detector sometimes malfunctions and does not detect non-metal items (Doc. 106, Ex.).

Melton and Clark state in their affidavits that Garment Factory inmates were searched in groups because it was more efficient, and the searches were conducted because of the operation of the prison enterprises Garment Factory and in order to meet the security needs of WCC (Doc. 106, Ex.).

Clark states in his affidavit that inmates work four ten-hour days, with smoke breaks and a lunch break (Doc. 106, Ex.). Clark further states in his affidavit that strip searches are conducted at the Garment Factory in groups of about ten inmates at a time, who are segregated into a specific room (measuring 30' X 12.5')

10

that is used to conduct the strip searches (Doc. 58, Ex.); that
room has windows next to the entry and exit doors (Doc. 106, Ex.).
Clark and Warden Morgan state in their affidavits that, during
searches, inmates put their clothes on two long, narrow tables in
the middle of the room; the tables are between the searching
officers and the inmates (Doc. 106, Ex.).  The visual searches are
conducted by at least one uniformed corrections officer plus one or
two corrections personnel trained in conducting searches (Doc. 106,
Ex.).

Inmates to be searched are arranged in the room, collectively
instructed to disrobe and place their clothes on the tables, the
officers search the inmates' clothes, and each inmate is instructed
to spread his buttocks, lift his genitals, and open his mouth for
visual searches of those areas; a change in procedures at one point
required inmates to squat and cough rather than spread buttocks and
lift genitals (Doc. 106, Ex.).  Clark states in his affidavit that
inmates are never physically touched by the corrections personnel
during the searches (Doc. 106, Ex.).  On completion of the
searches, the inmates partially dress in the search room (at a
minimum they put on their boxer shorts), then they exit and finish
dressing on two benches in the hallway (Doc. 106, Ex.).  Warden
Morgan, Melton and Clark state in their affidavits that, once the
inmates are dressed, they walk through the metal detector one at a
time (Doc. 106, Ex.).

11

Clark further states in his affidavit that he has personally found marijuana, stolen clothes, cell phones and money during the strip searches, and that metal shanks have been found hidden in the Garment Factory (Doc. 106, Ex.).

Warden Morgan states, in his affidavit (Doc. 106) that searches are necessary to prevent weapons and contraband from moving from the Garment Factory to the main prison area. Warden Morgan further states in his affidavit that the Garment Factory strip searches are conducted "privately," in accordance with Department of Corrections policies, because the inmates being searched are in a separate room, no females are present, and the inmates are partially redressed before stepping into the hall to finish redressing; Warden Morgan points out in his affidavit that the inmates are routinely nude in front of corrections officers when they shower or use the bathroom (Doc. 106). Warden Morgan states that the windows in the search room (and in other places such as bathrooms) are required for security purposes, to ensure that nothing improper is happening and in the event a hostage situation takes place (Docs. 106). Finally, Warden Morgan points out that routine strip searches may take place at any time, without the requirement of reasonable suspicion, and that visual body cavity searches may be conducted routinely without reasonable suspicion when an offender is entering or leaving the facility for work detail or after the offender participates in any physical

12

contact (Docs. 106).

3.

First, it is noted that Lewis does not allege excessive force or any injury resulting from the strip or body cavity searches. Under 42 U.S.C. § 1997e(e), an inmate cannot recover for mental and emotional injury suffered while in custody without a prior showing of physical injury.  The rule in the Fifth Circuit is that in the absence of proof of actual, compensatory damages, a plaintiff who has been deprived of his constitutional rights may only collect nominal damages.  However, the Fifth Circuit also adheres to the general rule that a punitive award may stand in the absence of actual damages where there has been a constitutional violation. Louisiana Acorn Fair Housing v. LeBlanc, 211 F.3d 298, 303 (5th Cir. 2000), cert. den., 121 S.Ct. 1225 (U.S. 2001).  Also, Carey v. Piphus, 435 U.S. 247, 255-56, 98 S.Ct. 1042, 1047-48 (1978).

Second, the CCA and LaDPSC rules and regulations regarding documentation of strip and body cavity searches do not create federally-protected rights in inmates for compensation when prison officials violate those rules.  The narrowing of prisoner due process protection announced in Sandin v. Conner, 515 U.S. 472, 115 S.Ct. 2293 (1995), left plaintiff without a federally-protected right to have prison regulations enforced by federal courts.  Any right of that nature is grounded in state law or regulation and the mere failure of an official to follow state law or regulation,

13

without more, does not violate constitutional minima.   Baker v. McCollan, 443 U.S. 137, 146-47, 99 S.Ct. 2689, 2695-2696 (1979); Murray v. Mississippi Dept. of Corrections, 911 F.2d 1167, 1168 (5th Cir. 1990), cert. den., 498 U.S. 1050, 111 S.Ct. 760 (1991). Also, Jackson v. Cain, 864 F.2d 1235, 1251-1252 (5th Cir. 1989). Therefore, Lewis' allegations that defendants did not properly document the searches do not state a claim for violation of his constitutional rights that is cognizable under Section 1983. Neitzke v. Williams, 490 U.S. 319, 109 S.Ct. 1827 (1989).   See Ordaz v. Martin, 5 F.3d 529, *9 (5th Cir. 1993).

Lewis also complains the searches were not conducted in accordance with CCA and LaDPSC policies.   In his affidavit, Warden Morgan shows that both the Department of Corrections and CCA had policies in place in 2009-2010 regarding strip search procedures, which authorized the strip searches and the visual body cavity searches that were conducted in this case.   See LaDPSC Department Regulation No. C-02-003(7)(E), (F) (Doc. 106).   Prison officials do not have to conduct strip searches of a large group of prisoners on an individual basis.   See Elliott, 38 F.3d at 191.   Under the facts and circumstances of this case, the Garment Factory searches at WCC appear to have been conducted in a reasonable and efficient manner designed to prevent the transportation by inmates of tools, material for weapons, money, phones, and garments from the Garment Factory to the main are of the prison.   Lewis has not alleged a

14

Fourth Amendment violation for the manner in which the searches were conducted.

The record also contains substantial evidence that the strip search and body cavity search policies at WCC are reasonably related to well known, common-sense, legitimate penological objectives in prison security.

Finally, the Fifth Circuit ordered this court to consider the factors enunciated in Watt v. City of Richardson Police Dep't, 849 F.2d 195, 196-197 (5th Cir. 1988) (citing Bell, 442 U.S. at 559, 99 S.Ct. at 1884),[1] balancing the need for the searches against the invasion of the inmates' personal rights, the manner in which the searches were conducted, the justification for the searches, and the places in which the searches were conducted. In summary of the discussion of this case set forth above, (1) Lewis' privacy rights were outweighed by the prison's need to strip search inmates who have access to materials and outsiders, to prevent the transportation of weapons, materials for weapons, cell phones,

---

[1] Watt involved a police strip search of a woman who had been arrested on an outstanding warrant for failure to register her dog in the City; the strip search was conducted just before she posted bail and was purportedly justified by the fact that she had been convicted of a minor offense the previous year. The court in Watt reasoned that "[r]easonableness under the Fourth Amendment must afford police the *right* to strip search arrestees whose offenses posed the very threat of violence by weapons or contraband drugs that they must curtail in prisons" and distinguished strip searches of arrestees charged with serious crimes and prison inmates from strip searches of arrestees such as Watt who are charged with minor offenses.

15

stolen garments, and money by the Garment Factory inmates into the main area of the prison (compare <u>Bell</u>, 441 U.S. at 558-559, 99 S.C. at 1884-1886; <u>Elliott</u>, 38 F.3d at 191); (2) the manner in which the searches were conducted, in groups of ten in a separate room, efficiently and quickly accomplished the objective of searching a large number of inmates (compare <u>Elliott</u>, 38 F.3d at 191-192); (3) the searches were justified by a legitimate penological interest in prison security, to prevent the transportation of contraband and weapons into the main area of the prison (compare <u>Bell</u>, 441 U.S. at 1885-1886, 99 S.Ct. at 559; <u>Montgomery</u>, 184 F.2d at *1); and (4) the searches of the groups of ten were conducted in the relative privacy of a small separate room that had two security windows for guards to see through (compare <u>Elliott</u>, 38 F.3d at 191). Therefore, the prison's strip and visual body-cavity searches of inmates in the Garment Factory were justified and reasonable.

Since there are no genuine issues of material fact which would preclude a summary judgment in favor of defendants, Ponce's motion for summary judgment should be denied and a summary judgment should be granted in favor of defendants.

<u>Conclusion</u>

Based on the foregoing discussion, IT IS RECOMMENDED that Lewis' complaint against Mrs. Millie Melton, Officer Sawyer, and Officer Johnson be DISMISSED WITHOUT PREJUDICE pursuant to Fed.R.Civ.P. rule 4(m) for lack of service of process.

16

IT IS FURTHER RECOMMENDED that defendants' motion for summary judgment (Doc. 106) be GRANTED and that Lewis' action be DENIED AND DISMISSED WITH PREJUDICE.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof. No other briefs (such as supplemental objections, reply briefs etc.) may be filed. Providing a courtesy copy of the objection to the magistrate judge is neither required nor encouraged. Timely objections will be considered by the district judge before making a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) CALENDAR DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Alexandria, Louisiana, on this ____ day of October 2015.

JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE

17